**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal Nos. GLR-25-129 & GLR-23-353** |
| | * | |
| **ERIC TANO TATAW,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ***** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR REVIEW OF DETENTION ORDER**

The United States of America, by and through undersigned counsel, respectfully submits this memorandum in opposition to the Defendant Eric Tataw's Motion for Review of Detention Order. *See* Criminal No. GLR-23-353, ECF 111, 112, 117. [1] The Government also reincorporates all its prior arguments for detention made at the original detention hearing on September 8, 2023 (ECF 96); at the hearing on the defendant's motion to modify release conditions on February 8, 2024 (ECF 97); in the Government's Opposition to Defendant's Motion to Modify Release Conditions (ECF 45); in the Government's Motion to Revoke Release (ECF 94); and at the detention hearing on June 11, 2025 (ECF 106).

Although the Maryland sexual assault charges against Tataw have now been dismissed, there are several recent developments that weigh in favor of detention. First, in January 2026, Tataw was convicted of the Maryland misdemeanor offense of keeping a disorderly house based on a two-year pattern of throwing unlawful, out-of-control, for-profit parties at his home that endangered his neighbors. Second, there is compelling new evidence that Tataw has committed

---

[1] These filings were also docketed in Criminal Number GLR-25-19, at ECF 28, 29, and 34. For efficiency's sake, we cite to the GLR-23-353 docket throughout this memorandum unless otherwise noted.

1

ongoing felony fraud while on pretrial release. Third, there is now an immigration detainer against Tataw, which both (1) provides additional incentive for Tataw to flee from authorities to avoid an order of deportation, and (2) provides an opportunity for Tataw to consent to removal to avoid prosecution for his crimes in the United States.

Under 18 U.S.C. § 3142(e)(3)(C), there is a rebuttable presumption that Tataw is both a danger to the community and a flight risk because he is charged with a federal crime of terrorism that carries a maximum term of imprisonment of ten years or more. There is also a rebuttable presumption that Tataw is a danger to the community under 18 U.S.C. § 3148(b) because there is probable cause to believe he has committed felony fraud while on pretrial release. In addition to these presumptions, the traditional 18 U.S.C. § 3142(g) factors weigh decisively in favor of detention. Tataw's pattern of lawless and predatory behavior over many years clearly demonstrates that he is dangerous and that he cannot be trusted to abide by conditions of release.

## I.    PROCEDURAL BACKGROUND

On August 31, 2023, U.S. Magistrate Judge A. David Copperthite issued a criminal complaint and arrest warrant charging Tataw with one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(1). ECF 1. Tataw was arrested later that evening. As alleged in the Complaint, Tataw approached a subpoenaed grand jury witness and urged him to provide false testimony and fraudulent documents related to an ongoing federal fraud investigation. *Id.* The witness alleged that Tataw "got close to Witness 1's face during the encounter and appeared ready to beat Witness 1." *Id.* ¶ 13.

The following day, September 1, 2023, Tataw had an initial appearance on the Complaint and was detained by agreement pending a hearing. At the detention hearing on September 8, 2023, the Government argued that Tataw should be detained because he was a flight risk and a danger to the community. After hearing from both parties, U.S. Magistrate Judge J. Mark

Coulson ordered Tataw released to home detention with 24-hour GPS monitoring and various other conditions.  ECF 15.  As relevant here, the Order made Tataw's release subject to the condition that "[t]he defendant must not violate any federal, state or local law while on release."  ECF 15, at 1.  Judge Coulson stressed that "the Court will have a very short patience with any violation of any conditions" and warned: "If you do violate any of the conditions, then there can be an immediate warrant issued, also a revocation of your release."  ECF 96 (Transcript of 9/8/2023 Detention Hearing), at 50.

On October 3, 2023, a federal grand jury returned an indictment charging Tataw with two counts of bank fraud, in violation of 18 U.S.C. § 1344, one count of money laundering, in violation of 18 U.S.C. § 1957, one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), and two counts of obstruction of justice, in violation of 18 U.S.C. § 1503.  ECF 23.  The Indictment alleges, among other things, that Tataw submitted multiple fraudulent loan applications for COVID-19 relief and used the funds for impermissible purposes.  The obstruction of justice counts expanded on the Complaint, alleging that Tataw solicited *two* witnesses to provide false testimony and fraudulent documents to a federal grand jury.  Following Tataw's initial appearance on the Indictment, he remained on the same conditions of release.  ECF 25.  Trial in this case is scheduled for April 20, 2026, roughly two months from now.

On April 24, 2025, a federal grand jury returned an Indictment charging Tataw with one count of attempting to provide material support or resources to terrorism, in violation of 18 U.S.C. § 2339A, and four counts of communicating interstate or foreign threats to injure or kidnap, in violation of 18 U.S.C. § 875(c).  GLR-25-129, ECF 1.  The Indictment alleges that from at least 2018 through 2020, Tataw, also known as the "Garri Master," or master of mutilation, conspired to provide money, weapons, and personnel to armed separatist groups in Cameroon and called for

3

the murder, maiming, and kidnapping of Cameroonian civilians, including schoolchildren.

Tataw had an initial appearance on April 25, 2025, in front of U.S. Magistrate Judge Charles D. Austin. Because the alleged conduct pre-dated the fraud indictment in GLR-23-353, the Government did not seek to revisit the detention issue at that time. Instead, the parties agreed to release on the same conditions imposed in GLR-23-353, and Judge Austin ordered Tataw to "abide by all conditions" imposed in that case. GLR-25-129, ECF 7, at 3.

On May 26, 2025, the Government moved for an arrest warrant and revocation of the release order based on a number of factors, including that Tataw had been charged in two new state criminal cases in Montgomery County, Maryland—in one case, with attempted second-degree rape, second-degree assault, and false imprisonment, and in another case, with keeping a disorderly house. Following a hearing on June 11, 2025, Judge Coulson granted the Government's motion and ordered Tataw detained based on the new sexual assault charges. ECF 106 (Transcript of 6/11/2026 Detention Hearing), at 71–74. Judge Coulson noted that if the sexual assault case "goes away for whatever reason," he would reopen the hearing based on changed circumstances and "refocus" on the Government's other arguments for detention. *See id.* at 72, 74.

In January 2026, Montgomery County dismissed the sexual assault charges against Tataw based on insufficient evidence, and Tataw filed the instant motion to reopen the detention hearing. ECF 111, 112, 117.

## II.    RELEVANT LAW

The Bail Reform Act, 18 U.S.C. § 3142, provides that a person charged with an offense shall be detained pending trial if, after a hearing, a judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making this

determination, the judicial officer shall take into account: (1) "the nature and circumstances of the offense charged, including whether the offense is … a Federal crime of terrorism," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."   18 U.S.C. § 3142(g).   There is a rebuttable presumption of detention "if the judicial officer finds that there is probable cause to believe that the person committed … an offense listed in 18 U.S.C. § 2332b(g)(5)(B)," which covers federal crimes of terrorism.   *See* 18 U.S.C. § 3142(e)(3)(C).   Providing material support to terrorists in violation of 18 U.S.C. § 2339A is one such federal crime of terrorism that triggers the rebuttable presumption of detention.   *See* 18 U.S.C. § 2332b(g)(5)(B).

A separate section of the Bail Reform Act, 18 U.S.C. § 3148, provides that a person released pending trial who has violated a condition of his release is "subject to a revocation of release" and "an order of detention."   18 U.S.C. § 3148(a).   Specifically, the Court "shall enter an order of revocation and detention" if, after a hearing, it:

(1) finds that there is—

    A. probable cause to believe that the person has committed a Federal, State, or local crime while on release; or

    B. clear and convincing evidence that the person has violated any other condition of release; and

(2) finds that—

    A. based on the factors set forth in section 3142(g) of [Title 18], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, or

    B. the person is unlikely to abide by any condition or combination of conditions

5

of release.

*Id.* § 3148(b).

Moreover, if there is probable cause to believe that the person has committed a federal, state, or local felony while on release, there is a rebuttable presumption that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community.  *Id.*  In other words, when a condition of pretrial release has been violated, § 3148 sets forth "markedly different standards for detention" than the initial release provisions of § 3142.  *United States v. White*, PWG-13-0436, 2015 WL 2374229, at *2 (D. Md. May 15, 2015).  "Under 18 U.S.C. § 3148, once probable cause exists that a person on pretrial release has committed a crime, the defendant is presumed to be a danger to the community."  *Id.*

### III.   TATAW HAS COMMITTED NEW CRIMINAL OFFENSES WHILE ON PRETRIAL RELEASE

#### A.  Maryland State Misdemeanor Conviction

On May 14, 2025, Tataw was charged with the Maryland offense of keeping a disorderly house, in violation of Maryland Criminal Law Section 10-202.  *See* Montgomery County District Court Case # D-06-CR-25-024294.  Keeping a disorderly house is a state misdemeanor offense punishable by a minimum of 10 days and a maximum of 6 months in prison.  Maryland courts have explained that although the punishment is fixed by statute, it is a common law crime. Specifically, under the common law, "a disorderly house is a nuisance, habitually kept which draws together dissolute persons engaged in unlawful and injurious practices, thereby to endanger the public peace and corrupt good morals."  *Olson v. State*, 208 Md. App. 309, 366 (Md. Ct. Special App. 2012).  By way of example, Maryland courts have held that a disorderly house includes a house of gambling, a house of prostitution, and a house where people assemble to engage in drug use.  *Id.* at 367.

A bench trial was held on January 6, 2026, in front of Maryland District Court Judge Victor M. Del Pino.[2] The court heard testimony from eight witnesses—five of Tataw's neighbors and three Montgomery County Police officers. The testimony established that between 2023 and 2025, Tataw used his home in a quiet, residential neighborhood on Woodfield Road to throw massive, raucous, fee-for-entrance parties, in violation of numerous local ordinances, with no regard for the desperate pleas of his neighbors or warnings by law enforcement officers to stop. These parties involved, among other things, (1) the busing of hundreds of people to the residence and charging of entrance fees without a permit, (2) the sale of liquor without a license, (3) the use of armed security guards, (4) excessive alcohol consumption and marijuana use, (5) loud music that violated noise ordinances (often laced with profanities), (6) public nudity, (7) partygoers trespassing on neighbors' property, (8) partygoers urinating, defecating, and vomiting on neighbors' property, (9) partygoers driving across neighbors' yards and causing damage to neighbors' property, (10) partygoers engaging in reckless and impaired driving through the neighborhood where young children play, (11) partygoers parking so as to block neighbors' driveways and the public road necessary for safe ingress and egress, (12) partygoers setting off illegal fireworks, and (13) the littering of used condoms, alcohol bottles, and other unsafe and unsanitary items throughout the neighborhood.

The court found that the witnesses testified credibly. Judge Del Pino disagreed with the defense's characterization that Tataw's neighbors "had an axe to grind," and found that they were "quite reserved based on what was taking place in their neighborhood," which he described as "absolute chaos" and "a circus." Notwithstanding its misdemeanor status, the court did not view the offense as "insignificant" and noted that there were "a litany of other criminal offenses that the

---

[2] A certified audio recording of the trial has been turned over in discovery and can be made available to the Court upon request. The quotes that follow come from the recording.

defendant could have been charged with here." The court found it particularly troubling that Tataw was "run[ning] a business throwing parties" and endangering the community by blocking the roads such that emergency personnel could not access the neighborhood.

Several of Tataw's neighbors provided victim impact statements prior to sentencing. Neighbor 1, a former public defender who brought Tataw an apple pie when he first moved into the neighborhood, told the court: "We have lived in fear for a number of years. … My kids' lives have been changed by this man. … He has demonstrated that he doesn't care about the laws, he doesn't care about restrictions." Neighbor 2 told the court: "[Tataw] has appeared on camera in interviews with news stations, on public television, saying that he has no remorse for this … and he's not doing anything wrong. I think that goes to show the lack of respect he has for his neighbors, the lack of respect he has for community, and the total misunderstanding he has about the things he's allowed to do and not allowed to do."

The court sentenced Tataw to the maximum period of incarceration of six months (all suspended), followed by two years of supervised probation. The high sentence reflects that this was not a garden-variety misdemeanor offense: it was a two-year pattern of flagrant disrespect for the law and reckless behavior that put his neighbors and their children at risk. Furthermore, Tataw committed this offense at the very residence the court authorized for his pretrial release, so it is clear that home confinement is insufficient to protect the community from him.

### B. Ongoing Felony Fraud

There is also compelling evidence that Tataw has committed ongoing felony fraud while on pretrial release—specifically, wire fraud, in violation of 18 U.S.C. § 1343, and bank fraud, in violation of 18 U.S.C. § 1344.

By way of background, beginning in 2021, Tataw induced Victim 1 to liquidate various personal and shared assets—including a Certificate of Deposit (CD) and two bank accounts—

8

under the guise that Victim 1 was investing in the development of the "Dimmples Social Media Platform" (Dimmples Social).[3]  *See* Exhibit 1 (Victim 1 GJ Testimony Transcript, Mar. 28, 2023) (Under Seal), at 22.   Tataw, who represented himself on Facebook to be a millionaire, *id.* at 24, claimed to be developing Dimmples Social into a Facebook-style social media platform specifically targeting the African continent.   *Id.* at 35.

Between January 26, 2021, and June 29, 2022, Victim 1 transferred $765,000 to the defendant via personal checks.   *See* Exhibit 2 (Victim 1 Grand Jury Exhibits 1-8) (Under Seal); *see also* Exhibit 1, at 29–34.   In June 2022, Tataw provided Victim 1 with a letter agreement acknowledging Victim 1's $765,000 investment and purportedly granting Victim 1 a 5% interest in the "shares/profit" of Dimmples Social.[4]   *See* Exhibit 1, at 29; Exhibit 2, at 8.

In reality, the evidence shows that Dimmples Social was a ruse, and Tataw and his wife used Victim 1's funds to obtain a home mortgage for their $1.3 million home on Woodfield Road in Montgomery County.

Less than two months after Victim 1's final investment payment on June 29, 2022, on September 9, 2022, Dimmples, Inc.'s Chase account (an account owned by Tataw) issued a cashier's check for $450,000 to Realty Title Service, a title company.   *See* Exhibit 3 (Check to Realty Title Service) (Under Seal).   The memo line of the check indicated the $450,000 was a gift to Beltha Mokube—Tataw's wife.   *Id.*   Analysis of the bank records indicates that this $450,000 was derived from Victim 1's payments for the development of Dimmples Social.

---

[3]  The shared assets were owned by Victim 1 and his spouse, Victim 2.   According to Victim 1, Victim 2 was aware of his investment into Dimmples Social.   *Id.* at 22–23. Victim 1 and Victim 2 are in their mid-60s and work 12-hour shifts as registered nurses.   *Id.* at 5–6.

[4]  Based on this arrangement, Dimmples Social would need to earn $15.3 million for Victim 1 to recover his $765,000 investment into the company. There is no evidence Dimmples Social has ever earned *any* revenue, let alone $15.3 million.

On September 20, 2022, Tataw's wife purchased the Woodfield Road home for $1,300,000. *See* Exhibit 4 (Woodfield Road Closing Disclosure) (Under Seal). As evidenced by the closing disclosure form, Tataw's $450,000 "gift"—which was really Victim 1's investment in Dimmples Social—was used to offset costs associated with the home's purchase. *Id.* at 3.

In his grand jury testimony, Victim 1 stated that he did not give Tataw permission to use Victim 1's investment monies to purchase real estate or to provide his wife with a gift. The money was to be exclusively used for the development of Dimmples Social. *See* Exhibit 1 (Victim 1 GJ Testimony Transcript, Mar. 28, 2023) (Under Seal), at 34.

But the fraud did not stop there. The evidence shows that between July 2024 and December 2025, while Tataw was on pretrial release, Tataw defrauded Victim 1 out of an additional $167,000.

In July 2024, Victim 1 wired two additional payments, totaling $70,000, to Dimmples Kettles, Inc., a business account belonging to Tataw's wife. *See* Exhibit 5 (Victim 1 2024 Wire Payments) (Under Seal). Investigators interviewed Victim 1 about these payments on February 12, 2026. According to Victim 1, in 2024, Tataw told Victim 1 he was now raising money to develop a "meat shop" called Dimmples Meat. Tataw invited Victim 1 to visit Tataw's business location in Landover, Maryland, and Victim 1 saw that Tataw already had some refrigerators and freezers in the room. Tataw also invited Victim 1 to a meeting with approximately eight other investors in the business. Tataw asked Victim 1 to invest $120,000 and promised to give Victim 1 a percentage of the ownership in the business of approximately 5-10%. Tataw also assured Victim 1 that he would return Victim 1's investment if the Dimmples Meat business venture was unsuccessful.

Based on Tataw's representations, Victim 1 transferred $120,000 to Tataw to invest in Dimmples Meat. He later transferred $20,000 more when Tataw said he was having problems

10

paying rent for the Dimmples Meat location. Victim 1 stated that the $70,000 in wire payments to Dimmples Kettles, LLC were part of Victim 1's $140,000 total investment in Dimmples Meat. (Victim 1 clarified that he wired these payments to the Dimmples Kettles account because that is what Tataw instructed him to do, but he did not understand himself to be investing in Dimmples Kettles, which was a separate restaurant Tataw claimed to be opening.)

In March 2025, Tataw again told Victim 1 that he needed help paying rent he owed at the Dimmples Meat location. On March 2, 2025, Victim 1 withdrew another $15,000 from his bank account and brought it to Tataw at Tataw's house in Gaithersburg (*i.e.*, the Woodfield Road house). Tataw sent Victim 1 a notice from the court showing that he owed approximately $26,000 in rent for the Dimmples Meat location. Tataw told Victim 1 that his $15,000 would be used to pay down the rent owed, and Tataw and other investors would pay the remainder of the balance.

Contrary to Tataw's representations, Tataw did not use Victim 1's $15,000 payment to pay down the rent owed at the Dimmples Meat. In fact, on March 26, 2025, the Maryland District Court entered a money judgment against Tataw for unpaid rent in the amount of $25,490 and granted the landlord the right to take possession of the property. *See* Exhibit 6 (Dimmples Meats Money Judgment). The money judgment shows that Tataw did not pay a single dollar of rent for the entire period from March 2024 to March 2025. *Id.*

Maryland business records show that Tataw registered Dimmples Meat, LLC on August 25, 2023, but it is no longer in good standing. On April 8, 2025, an HSI case agent visited the Dimmples Meat location and observed that it appeared to be shuttered and nonoperational. There was no sign on the property identifying it as Dimmples Meat. Below is a photo from the HSI agent's surveillance.

11



On February 13, 2026, investigators contacted a representative from Prince George's County Health Department's Licensing Division, who stated that neither Dimmples Meat nor Dimmples Kettles ever applied for any food license in order to operate a food business.

Victim 1 stated that Tataw never informed Victim 1 about the money judgment or the shuttering of the business. Victim 1 further stated that Tataw still calls Victim 1 from jail (sometimes through his wife, Beltha), and the last time they spoke, which was within the last few months, Tataw told Victim 1 that his "Maryland guys" were taking care of the meat shop, and "everything is okay." Victim 1 told investigators that he still has not received any returns on his investments in either Dimmples Social or Dimmples Meat.

But the fraud did not stop there. Victim 1 said that in approximately November or December 2025, Tataw's wife, Beltha, drove to Victim 1's residence and pleaded for more money on Tataw's behalf in order to bail Tataw out of jail. Victim 1 reluctantly gave her another $12,000 in cash, which was purportedly to be used for Tataw's bail. At that point, however, Tataw had been ordered detained *without* bail by courts in both Montgomery County and the District of

Maryland.   The Government does not know what Tataw and his wife did with the $12,000 in cash, but Victim 1 said that roughly a month later, in January 2026, Beltha suddenly told Victim 1 that Tataw's state rape charges would be dismissed because the young lady "did not show up."

In summary, there is probable cause to believe that Tataw has committed ongoing felony fraud while on pretrial release.   Moreover, he has carried out this fraud while confined to his home on Woodfield Road (and continued it while in jail, through his wife and accomplice). Accordingly, there are no release conditions that will sufficiently protect members of the community from Tataw's predatory behavior.   Tataw cannot rebut the presumption that he is a danger to the community under § 3148(b).

### C. THE TRADITIONAL 18 U.S.C. § 3142(g) FACTORS WEIGH IN FAVOR OF DETENTION

#### a.  Nature and Circumstances of the Offenses & Weight of the Evidence

Tataw's offenses are extremely serious.   He is charged in two separate cases with bank fraud, money laundering, aggravated identity theft, obstruction of justice, material support for terrorism, and threats to kidnap and injure.   Many people were hurt as a result of Tataw's crimes. As noted above, the material support charge triggers a presumption that Tataw is a danger to the community and a flight risk.

There is overwhelming evidence supporting these charges in the form of bank records, loan applications, witness testimony, and Tataw's own statements on social media.   In each case, a lengthy speaking indictment explains the nature of Tataw's crimes and describes the supporting evidence in significant detail.   In particular, the material support indictment alleges that Tataw "personally authored hundreds of social media posts in which he called for attacks against Cameroonian civilians, sought to raise funds for weapons, and threatened those he viewed as cooperating with the government of Cameroon."   GLR-25-129, ECF 1, at 3.   Tataw also

"directed the maiming of civilians in Cameroon by the severing of their limbs," and "reveled in his self-styled name as the 'Garri Master,' or master of mutilation." *Id.* In one instance of particularly brazen cruelty, the Indictment alleges:

> On or about August 26, 2018, in a video that was later shared on YouTube, **TATAW** stated that any child who violated the ban on school attendance in the Anglophone regions would be maimed, warning: "Give them small Garri ... give them Garri on this finger [demonstrating how to cut off the finger at the bottom by the palm]. … When we give one hundred children Garri on this finger . . . they not going to talk about school." **TATAW** explained that it was acceptable to hurt" stubborn children" because "when it's war, it's war," and "there's no school in a war zone."

*Id.* at 6.   It is hard to overstate the seriousness of Tataw's offenses or the danger he poses.

### b.  History and Characteristics of the Defendant

Tataw has a long history of criminal behavior of all stripes.   *First*, he has a long history of violence, threats, and reckless behavior.   Much of this behavior has been discussed in the sections above.   We provide some additional examples below.

On May 12, 2023, Tataw was convicted of driving while under the influence of alcohol in Montgomery County District Court Case # D-06-CR-22-006477 and sentenced to one year in prison (suspended) and 18 months of supervised probation.   The facts of the case are appalling. The incident report shows that on December 4, 2022, at a little after 2 a.m., Tataw was pulled over for going 90 miles per hour in a 60 miles-per-hour zone, erratically changing lanes, and straddling lanes on the highway.   *See* Exhibit 7 (DUI Incident Report). The officer smelled alcohol emanating from the vehicle, and Tataw appeared extremely intoxicated.   While the officer was standing inside the driver's door frame, Tataw suddenly drove away at a high rate of speed.   *Id.* He continued to flee from the officer for over 13 miles, ignoring the officer's lights and sirens, and repeatedly driving on the wrong side of the road.   *Id.*   Tataw eventually made it back to his house on Woodfield Road, and officers spoke to him there.   *Id.*   Tataw refused a sobriety test and made

14

a number of patently false statements to the officers.   Among other things, he claimed that (1) he did not know the lights and sirens were for him, (2) he was speeding home because his wife told him she needed help with their child, and (3) he was only drunk because immediately upon getting home, he drank an entire bottle of Hennessey.   *Id.*

This is extremely concerning behavior.   Tataw easily could have killed other people on the road or killed the police officer who stopped him when he suddenly drove off while the officer was standing in his door frame.   He refused to take responsibility for his actions and blatantly lied to the police.

On March 29, 2025, Montgomery County police officers were dispatched to Tataw's home for a report of an assault by one of Tataw's female tenants ("Tenant").   According to the incident report, Tenant reported that in February 2025, Tataw took Tenant's phone from her and slapped her, giving her a bloody nose.   *See* ECF 94-7 (Assault Incident Report) (Under Seal).   Tenant was scared to report the incident while she still lived in Tataw's home, but she called the police once she was in the process of moving out.   Although the incident did not result in criminal charges, Tataw's conduct constituted a felony assault if Tenant's allegations are credited.

On April 28, 2025, two civil peace orders were entered against Tataw based on allegations by Neighbor 3 and Neighbor 4 that Tataw assaulted them and threatened them with violence on April 24, 2025.   The petition for the peace order alleges that Neighbor 3 and Neighbor 4 were watering privacy trees on the edge of their property when Tataw aggressively confronted them, threatened to "knock out [Neighbor 3's] teeth," and threatened to "come and slap [Neighbor 4]." *See* ECF 94-6 (Civil Peace Orders) (Under Seal). Neighbor 3 and Neighbor 4 "fear[ed] for [their] immediate safety due to [Tataw's] aggressive behavior and violent threats," and Neighbor 3 called 911 to report the incident.   The incident happened shortly after Tataw learned that he had been indicted on new federal charges in GLR-25-129.   Again, although the April 24, 2025 incident did

not result in criminal charges, Tataw's conduct constituted a felony assault if Neighbor 3 and Neighbor 4's allegations are taken as true.[5]

On May 20, 2025, Tataw was charged with the Maryland felony offenses of attempted second-degree rape, second-degree assault, and false imprisonment in the Montgomery County District Court Case # D-06-CR-25-024928.  A warrant was issued for his arrest the same day. According to the statement of charges, the incident occurred on May 11, 2025 at Tataw's home in Gaithersburg, Maryland.  *See* ECF 94-4 (Rape Statement of Charges) (Under Seal). The victim reported that Tataw locked her in a room, grabbed her, and forced himself on her while half-nude and wearing a condom, although the victim repeatedly rejected his advances.  Montgomery County police officers executed the arrest warrant on May 23, 2025, and Tataw was ordered detained pending trial.  On or about January 15, 2026, Montgomery County dismissed the sexual assault charges based on insufficient evidence.  The Government does not know why Montgomery County's assessment of the evidence changed.  It is noteworthy, however, that Tataw has a history of tampering with witnesses.

*Second*, Tataw has a long history of fraud, obstruction of justice, and lying to victims, law enforcement, Pretrial Services, and even to this Court:

> (1) He lied to police when he was pulled over for drunk driving.

---

[5]    In Maryland, "assault" is defined as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings."   Md. Code Ann. Crim. L. § 3-201(b). Maryland courts have recognized that "an individual can commit an assault by 'intentional[ly] frightening' someone, even absent physical contact."   *Garcia v. Montgomery County, Maryland*, 145 F. Supp. 3d 492, 520-21 (D. Md. 2015) (quoting *Wieland v. State*, 101 Md. App. 1, 643 A.2d 446, 464 (1994)).   Such as assault is a second-degree assault punishable by up to ten years in prison.   *See* Md. Code Ann. Crim. L. § 3-203.   "Second-degree assault based on an intent to frighten has three elements: (1) the defendant committed an act with the intent to place the victim in fear of immediate physical harm; (2) the defendant had the apparent ability at the time of the act to bring about the threatened physical harm; and (3) the victim was aware of the threat of physical harm."   *Garcia*, 145 F. Supp. 3d at 521 (quoting *Jones v. State*, 440 Md. 450, 103 A.3d 586, 589 (2014)).

(2) He instructed multiple witnesses to provide false testimony and fraudulent documents to a federal grand jury investigating him for loan fraud.

(3) The grand jury returned an indictment charging him with loan fraud, aggravated identity theft, and obstruction of justice.  ECF 23.

(4) He duped Victim 1 into investing $765,000 in a fictitious business venture, when in reality, he used the money to purchase his $1.3 million home on Woodfield Road and support his lavish lifestyle.

(5) Between July 2024 and March 2025, while on pretrial release, he defrauded Victim 1 out of approximately $155,000 by falsely representing that it would be invested in his defunct company Dimmples Meat (including approximately $35,000 for rent payments that were never made).

(6) In November or December 2025, he defrauded Victim 1 out of an additional $12,000 by falsely representing it was to pay for his bail.

(7) He lied when he requested that this Court modify his conditions of release to allow him to work at Dimmples Kettles, claiming that it was a functioning restaurant. *See* ECF 30.  But when agents visited the premises, they found an empty storefront with dust and debris coating the floor.  *See* ECF 45, at 3.  He later submitted a financial statement that was flatly inconsistent with publicly available information about the business.  *Id.* at 3–5.  Tellingly, on May 16, 2025, a money judgment of over $100,000 was entered against him for failure to pay rent at the Dimmples Kettles location.  Exhibit 8 (Money Judgment, Dimmples Kettles).

(8) Finally, he lied to Pretrial Services about who lived in his home on Woodfield Road.  During the original home assessment, he told Pretrial Services that the only residents of the home were himself, his wife, and his daughter.  He never updated

Pretrial Services about anyone else living in the house. Based on the testimony at the last detention hearing on June 11, 2025, it is clear that numerous other people have rented rooms in the house while he has been on pretrial release. *See* ECF 106, at 50–53 (testimony by Angela Orau that she and numerous other people rented rooms in Tataw's house). Pretrial Services was never able to vet these individuals because Tataw never informed Pretrial Services about them.

District Courts in the Fourth Circuit and elsewhere have considered a defendant's "lack of truthfulness" in their assessment of a defendant's "flight risk and dangerousness to the community." *United States v. Nagbe,* No. 1:24-mj-490 (RDA), 2024 U.S. Dist. LEXIS 229188, at *11-12 (E.D. Va. Dec. 18, 2024); *see also United States v. Mitchell,* No. 1:23-mj-157 (RDA), 2023 U.S. Dist. LEXIS 148807, at *16-17 (E.D. Va. Aug. 23, 2023) (holding that a defendant's "lack of candor to pretrial services, and by extension to the Court, was troubling and raise[d] issues about supervision"), *citing United States v. Maxwell*, 510 F. Supp. 3d 165, 175 (S.D.N.Y. 2020) ("Most notably, the Defendant's pattern of providing incomplete or erroneous information to the Court or to Pretrial Services bears significantly on the Court's application of the third [§ 3142(g)] factor to the present case."). Here, Tataw's pattern of lies demonstrates that he cannot be trusted to abide by conditions of pretrial release and report truthfully to the Court and Pretrial Services.

### c. Nature and Seriousness of the Danger to the Community

Tataw poses a grave danger to the community in myriad ways. His course of conduct over nearly a decade makes it highly likely that he will continue to defraud innocent victims, tamper with witnesses, assault and threaten neighbors and tenants, provide material support for terrorism, and otherwise engage in violent, deceptive, and reckless behavior that endangers the community. His flagrant disregard for the law and for his pretrial release conditions should not be allowed to

continue.   At the original detention hearing in September 2023, Judge Coulson stressed that "the Court will have a very short patience with any violation of any conditions."   ECF 96 (Transcript of 9/8/2023 Detention Hearing), at 50.   Patience is no longer warranted when the danger to the community is so high.   Enough is enough.

### D. THE NEW ICE DETAINER CREATES AN ADDITIONAL INCENTIVE FOR TATAW TO FLEE PROSECUTION

As noted above, Tataw is now subject to an immigration detainer, which was issued by the Department of Homeland Security on May 25, 2025.   Tataw has indicated that if he is released to the immigration detainer, "he intends to request that he be released on any pending immigration case."   ECF 117, at 2.   It is the Government's understanding based on discussions with the DHS attorney assigned to Tataw's case that he would be subject to mandatory detention in the immigration case, regardless of his release status in his other pending cases.

Although courts have taken different views regarding the significance of an immigration detainer in the detention analysis, many courts have found that an immigration detainer can, in certain circumstances, provide additional incentive for a defendant to flee in order to avoid deportation.   *See, e.g.*, *United States v. Neves*, 11 F. App'x 6, 8 (1st Cir. 2001) (affirming revocation of pretrial release order, finding the defendant had "a strong incentive to flee . . . to avoid the near-certainty of a prison sentence followed by deportation"); *United States v. Mejias-Mejias*, 771 F.Supp. 3d 688, 692 (D. Md. 2025) ("the existence of a pending detainer and forced removal may be relevant to the flight risk determination to the extent that the potential removal provides incentive to an individual able to flee"); *United States v. Rodriguez-Fuentes*, No. 5:24-CR-00122-KKC-MAS2025, WL 711955, at *6 (E.D. Ky. Mar. 5, 2025) (finding that ICE detainer was "one more factor weighing towards finding the United States established serious risk of flight

by preponderance of the evidence").

In addition, some courts have construed the existence of an ICE detainer as indicative of a flight risk where the defendant "expressly desires or seeks out deportation." *United States v. Herrera-Quino,* No. 23-mj-16105, 2024 WL 376677 at *4 n.4 (D.N.J. Feb. 1, 2024); *see also United States v. Hernandez-Cerrato*, Crim. No.: MJM-23-419, 2024 WL 1532748, at *7 (D. Md. Apr. 9, 2024) (agreeing with the government that "even while in ICE custody, Mr. Hernandez could effectively flee from prosecution simply by consenting to deportation"). Although we believe Tataw should be detained independent of the ICE detainer, we submit that it, too, weighs in favor of detention. We also note that release to the ICE detainer would create significant logistical hurdles in ensuring the Defendant's appearance at his upcoming fraud trial on April 20.

### E.  CONCLUSION

Tataw has engaged in a disturbing pattern of violence, threats, reckless behavior, fraud, and deception over a period of many years. This pattern has only escalated since the original order of release in the witness tampering case, his October 2023 indictment on charges of fraud and obstruction of justice, and his April 2025 indictment on charges of conspiring to provide material support to terrorism and transmitting threats to kidnap or injure. He has flouted his pretrial release conditions and continued to break the law and hurt innocent people. He is a grave danger to the community, and he cannot be trusted to abide by his conditions of release. For all these reasons, the United States respectfully requests that the Defendant be detained pending his trial on April 20.

Respectfully Submitted,

Kelly O. Hayes
United States Attorney

/s/_____

20

Christina A. Hoffman
Joseph L. Wenner
Assistant U.S. Attorneys

A.  Tysen Duva
Assistant Attorney General
Criminal Division
U.S. Department of Justice

/s/_____
Chelsea Schinnour
Trial Attorney
Human Rights and Special Prosecutions Section
Criminal Division
U.S. Department of Justice

21